## BEAVER BOARD COMPANIES v. IMBRIE et al.

## In re STATE OF SANTA CATHARINA, REPUBLIC OF BRAZIL.

(District Court, S. D. New York. August 15, 1921.)

### No. 296.

Banks and banking ⬥80 (10)—Bonds held purchased outright by banking and bond house, so that state issuing bonds not entitled to accounting by receiver of bond house.

Contract between a South American state and a firm of New York brokers and bankers *held* a contract of purchase by the firm of the bonds of the state, paid for by the firm's opening a credit on their books in favor of the state, so that the relation of debtor and creditor was created, and the state was not entitled to an accounting from the firm or its receiver, as from an agent or trustee.

In Equity. Suit by the Beaver Board Companies against James Imbrie and others, copartners doing business as Imbrie & Co. Claim of the State of Santa Catharina, Republic of Brazil, expunged.

See, also, 275 Fed. 437.

Zalkin & Cohen, of New York City, for receivers.

Rabenold & Scribner, of New York City, for defendants.

Davies, Auerbach & Cornell, of New York City, for State of Santa Catharina.

MANTON, Circuit Judge. Receivers have been appointed for Imbrie & Co., the defendants in this action, seeking to conserve the assets of this firm. The defendants were brokers, and were also engaged in business as bankers. A claim has been filed by the state of Santa Catharina, republic of Brazil, which seeks an accounting from the defendants as agents and for a return of the bonds referred to herein. A motion is made to expunge this claim.

On November 3, 1920, Imbrie & Co. and the state of Santa Catharina, republic of Brazil, entered into a contract providing as follows:

Santa Catharina Fiscal Agency and Bond Purchase Contract

Liber 66, folio 76.

Deed of purchase and sale and other agreements made by the state of Santa Catharina, as grantor, and Imbrie & Co., as grantee, in the form below:

Let All to Whom These Presents shall Come Know:

That in the year one thousand nine hundred and nineteen, on the third day of the month of November, in this city of Rio de Janeiro, in my office, before me, the notary, appeared as true contracting parties:

On the one hand, as grantor, the state of Santa Catharina, represented by its Governor, His Excellency Doctor Hercilio Pedro da Luz, duly represented by his attorney in fact, Colonel Elyceu Guilherme da Silva, residing in this city, by virtue of the power of attorney which he presented, and which on this date is recorded in the proper book of my office, in the presence of the Secretary of Finance and Public Works of the said State, Dr. Adolpho Konder, resident in the same state and temporarily in this city.

And on the other hand, as grantees, Imbrie & Co., bankers in New York, United States of America, represented by their partner, Frederico Lage, resident in New York, and temporarily in this city; the parties present being

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

known to me, the notary, and to the witnesses below mentioned and subscribing, who are also known to me, to which I certify.

And in the presence of the said witnesses, the grantor, the state of Santa Catharina, through its Governor, declared that:

Whereas, the grantor desires to conclude a trust agreement for the creation and issue of five thousand state bonds, of the par value of one thousand dollars ($1,000) each, according to the terms and conditions which have been agreed upon in the minute hereinafter mentioned, which is made a part hereof; and

Whereas, the grantor is desirous to sell said bonds and Imbrie & Co. is willing to purchase the same; and

Whereas, the state of Santa Catharina is further desirous of appointing a fiscal agent in New York in connection with the service of said bonds and for the purpose of maintaining its credit in the New York market:

Now, therefore, in consideration of the foregoing and the mutual covenants hereinafter expressed, it has agreed with the grantees, Imbrie & Co., as follows:

### Clause I.

(a) At any time before December 1, 1919, the state of Santa Catharina agrees to make with such bank or trust company of the United States of America which Imbrie & Co. may designate the trust agreement above referred to, in accordance with the minute which it now approves and rubricates on all its pages, in order that it may, as aforesaid, become an integral part of the present instrument, and further agrees to issue five thousand state bonds, of the face value of one thousand dollars ($1,000) each, under the terms, conditions, and with the guaranty mentioned in the said contract.

(b) The state hereby sells and assigns to the said Imbrie & Co., bankers, the five thousand bonds for the sum of four million three hundred and twenty-five thousand dollars United States gold, and agrees to deliver the same on the first day of January, 1920, at the principal office in the city of New York of the trustee named in said trust agreement, or wherever said trustee may designate.

(c) Imbrie & Co. purchase said bonds and upon delivery thereof as aforesaid agree to pay to the state the said sum of four million three hundred and twenty-five thousand dollars, as follows: On January 1, 1920, two million three hundred and twenty-five thousand dollars, and on February 1, 1920, two million dollars.

(d) The aforesaid payments shall be made by depositing the respective sums to the credit of the state with such trust company, bank, or bankers in the United States of America as the Governor of the state may designate.

### Clause II.

(a) The state of Santa Catharina hereby appoints Imbrie & Co. its fiscal agent with reference to the issue of bonds, described as 'State of Santa Catharina, Brazil, 6% External Secured Sinking Fund Gold Bonds of 1919,' in said trust agreement.

(b) Imbrie & Co. hereby acccept said appointment.

(c) The state of Santa Catharina agrees that, in case it shall determine to purchase any of the bonds of said issue for the sinking fund in accordance with the provisions of the said trust agreement, it will make such purchases through Imbrie & Co., who shall receive for such service a commission of one-half of 1 per cent. on the purchase price, exclusive of interest, or in case the bonds shall have been listed on the New York Stock Exchange then in lieu of said ½%, the commission fixed by said Exchange: Provided, however, that said commission shall be payable to Imbrie & Co. only in case the purchases shall be effected at a price which, with said commission added, shall be less than the face value of the bonds purchased.

(d) The fiscal agent may, instead of acting personally, employ and appoint agents and attorneys as it may deem desirable.

(e) The fiscal agent shall be answerable to the state only for its own willful misconduct.

(f) The fiscal agent shall have, in addition to other rights, powers, and duties conferred by law and by this agreement, the following:

(1) It shall from time to time receive all sums paid to it by the state, or received by it for account of said state, and shall use and apply them in accordance with this agreement.

(2) In case the state should purchase bonds of said issue through the fiscal agent in accordance with the provisions hereof, the fiscal agent shall at the proper time or times present the said bonds to the said trustee and receive payment of principal and interest from said trustee for account of the state, and hold the sum or sums so received for the benefit of the state and subject to the directions of the Governor of the said state.

(3) The fiscal agent shall cause the definitive bonds of said issue to be engraved, temporary bonds being printed as provided in the trust agreement for account of the state.

(4) In the event that the said state should determine to have the bonds of said issue listed on the Stock Exchange in the city of New York, the fiscal agent shall attend to the details of the listing of said bonds for the said state, and transmit to it for signature or execution any and all papers and documents necessary in connection therewith.

(5) In all cases where it may be necessary or desirable for the state to give or publish any notices in connection with the bonds of said issue, the fiscal agent shall (where the said duty is not imposed upon the trustee) attend to the publishing or giving of said notices on behalf of the state.

(6) The fiscal agent shall from time to time advise the state of any matters coming to its knowledge regarding the facilitating of the sale and delivery of the said bonds, transmit to said state notices, addressed to the state, and also transmit to it any and all information believed by said fiscal agent to be of interest or advantage to said state in connection with the issue of said bonds, or the credit of the state.

(7) It may, subject to the terms of this agreement, act in accordance with the written order of the Governor of the state, and such orders shall be full protection to the fiscal agent for action in accordance therewith.

(8) The fiscal agent shall keep in New York accounts of receipts and disbursements in connection with its agency, and statements of such accounts, with copies of the vouchers covering expenditures, shall be rendered to the state at the expiration of each year and at such other times as the state may request.

(9) Statements of account rendered by the fiscal agent shall be conclusive on the state, save as specific objection in writing by the state to such statements of account shall be received by the fiscal agent within three months after the delivery of such statements of account to the state.

(10) The fiscal agent shall only be answerable for such moneys as may be actually received by it in New York from the state or for its account. It will allow interest at the rate of two per centum (2%) per annum on the average daily credit balances in accounts representing all receipts and disbursements. The fiscal agent shall not be chargeable with interest, except as aforesaid.

(11) The fiscal agent may acquire and hold any of said bonds with the same rights as if it were not fiscal agent hereunder.

(g) The fiscal agent may withdraw and resign by giving notice to the state of such intention, specifying the date when it is desired that such withdrawal shall take effect, which shall be not less than four months, unless a shorter notice shall be accepted by the state.

(h) The fiscal agent in custody of moneys hereunder shall be liable only as banker. It shall be protected in acting upon any notice, request, consent, certificate, bond, or other paper or document believed by it to be genuine and to be signed by the person or persons purporting to sign the same. It may advise the legal counsel and shall incur no liability for any action taken or suffered hereunder by it in accordance with the opinion of such counsel.

(i) At the end of each year during the life of this agreement, on written request of the fiscal agent, made to the Governor of the state, there shall be paid to it all expenses made in good faith, verified by both parties, in the performance of any duty imposed upon it under this contract.

275 F.—28

### Clause III.

The grantor assures the grantee of the preference of the grantee, under equal conditions, for any other external loan which the grantor may contract while the bonds which are now being sold are not fully redeemed.

The grantees and also the grantor, in the presence of the said witnesses, declare to me that they accepted this instrument and that they agree to comply with all its clauses and conditions, and a receipt of the following tenor was delivered to me:

9695. Collector's Office of the Federal District Stamp Tax. Fiscal Year of 1919. Reis 39:200$000. In the book of receipts the treasurer is debited with the sum of 39:200$000 received from the Governor of the state of Santa Catharina as stamp tax on the sum of 39.600:000$000, equivalent to $5,000,000 at the rate of exchange of 3$920, latest official quotation, corresponding to the amount of the loan contracted by the said state with Imbrie & Co., bankers in New York, in accordance with Report No. 5, Collector's Office of the Federal District, November 1, 1919.                    P. Capelli, Clerk,
                                                                        A. Pinto, Treasury Agent.

And as they so declared, executed, and accepted, to which I certify, they requested of me this deed, which I caused to be drafted by my assistant, Deusdedit Menezes, as it had been assigned to me.

And having been read to the parties and to the witnesses present during the entire act, they approved it and sign with the said witnesses, Drs. Joaquim Thiago da Fonseca, Emilio M. Nina Ribeiro, before me, Damazio Oliveira, acting notary, who signs.                    Elyseu Guilherne da Silva.
                                                                        Adolpho Konder.
                                                                        Imbrie & Co.
                                                                        Joaquim Thiago da Fonseca.
                                                                        Emilio M. Nina Ribeiro.

Copy issued to-day.  I, Damazio Oliveira, acting notary, sign in public.
A true copy:                              [Signed]  Damazio Oliveira.

Under an act of Congress of the state of Santa Catharina, on August 16, 1919, the Governor was authorized to contract an internal and foreign loan up to $5,000,000 gold, to be applied to a bridge or ferryboat connection between the capital and the continent, to electric tramway construction in and about the capital, to road construction, and to sanitation. In addition to the general guaranty, there was a special guaranty of territorial taxes and of any others in the discretion of the government, which should be given as a pledge for the faithful payment of the interest and sinking fund of the loan. It was pursuant to this authority that the contract was made. Five thousand bonds, of the denomination of $1,000 each, were issued under a trust agreement of February 25, 1920, between the state of Santa Catharina and the Equitable Trust Company of New York. The indenture contained the following provision:

"That Santa Catharina has at least 5,000,000 inhabitants, has an annual budget of about $1,400,000, has total debts, foreign, internal, and floating of $1,906,170; that the state assigns as security for the loan the 'industrial and professional tax,' 'territorial tax,' the 'capital tax,' and 'export tax,' estimated to amount for 1920 to $826,977, subject in part to prior charges to secure bonds totaling £198,426, with annual charges in favor of such prior issues of £17,649.

"The state represents that all acts done prior to the issue of the bonds above mentioned have been done strictly in accordance with the laws of the state and of the Brazilian federation, and that all acts, conditions, and things required to be done, to happen, or to exist prior to the issuance of the bonds have been done, have happened, and exist, with due and strict compliance with the laws and Constitution of the state of Santa Catharina and of the United States of Brazil.

"The full faith and credit of said state are irrevocably pledged for the prompt payment of the bonds and interest, and the bonds shall always constitute a direct liability of the state, irrespective of any security provided.

"In case of default in principal, interest, sinking fund, or any installment thereof, the state will deliver the revenues of the aforesaid special taxes to the trustee as and when collected, and the trustee may bring direct action before the Brazilian courts against the state for the collection of the amounts in default and make effective the security of said special taxes."

Pursuant to the contract of November 3, 1919, these bonds were delivered to Imbrie & Co., and Imbrie & Co. opened a credit on their books in favor of the state of Santa Catharina, and proceeded to treat the bonds as their own, taking the position that it was a sale and purchase of such bonds. If there was a sale and purchase of the bonds, and the relation created is that of debtor and creditor, the claim in the present form should be expunged; for in such case Imbrie & Co. would owe to the state the difference between moneys which were paid for such bonds and the $5,000,000 to be paid, less their agreed commissions. The contract—Clause I(c)—provides for the purchase of said bonds, and upon delivery thereof Imbrie & Co. agree to pay to the state $2,325,000 on January 1, 1920, and $2,000,000 on February 1, 1920, "by depositing said sums to the credit of such bankers" as, pursuant to clause I (d), the Governor might designate, and the Governor did designate Imbrie & Co. as such depositary. A telegram of March 1, 1920, to the Equitable Trust Company reads as follows:

"As Governor of state Santa Catharina, I have designated Imbrie & Co. as depositary under Clause I, subdivision (d), of contract of November 3, 1919. Imbrie & Co. have paid the purchase price of the bonds through a credit which they opened on their books in favor of the state. The provisional bond deposited with Banco Hollandez has been duly issued and belongs to Imbrie & Co."

On September 10, 1920, the Governor cabled Imbrie & Co. as follows:

"State has nothing to do with difficulties you have claimed to encounter in offering loans (i. e., marketing the bonds), for your undertaking was that of a purchaser, and not merely an intermediate broker for the placing of the loans. In so far as state is concerned, and for all purposes, total bonds, in number 5,000, have been placed, so much so that state has already made payment first interest coupon in accordance with telegrams sent May 1 and acknowledged May 27. Your status as regards the state is that of a debtor of a definite sum in United States gold held at our unqualified disposal and acknowledged by you in current account rendered over your signature. * * *"

And on September 17 he cabled as follows:

"The undertaking of the state was faithfully discharged, as have been discharged all obligations of the state under the contract. * * * It is your obligation as a debtor to the state to pay to the same the proceeds of the bonds which were sold to you. * * * According to the contract, the loan is secured by state revenues clearly specified. * * *"

This transaction and the contract under which it was carried out, together with the cablegrams, indicates clearly that the relation between the parties was that of debtor and creditor, and that there was a sale and purchase of the bonds in question. The claim filed with

the receivers sets forth the authority of the Governor of the state to make the contract in question. It provides:

"The Governor of the said state of Santa Catharina was, at the time when the said contract was made, duly authorized to represent the said state in the making of the said contract and to make the same."

The state has defaulted in paying the semiannual interest due June 1, 1921, and it now disputes the validity of the bonds. It has received on account of the said bonds $1,541,010.72. The contention of the state is that the bonds were in the hands of Imbrie & Co. as agents, and paid for, so that the fiscal agents are subject to an equitable suit for an accounting for the bonds, and that the state is entitled to re- scind the contract and require Imbrie & Co. to pay "all damages that might fall to the state on account of the inability of Imbrie & Co. to account for the bonds or to return them."

What, in point of fact, was the intention of the parties, must be obtained from the contract and the conduct of the parties prior to the time of the appointment of the receivers of Imbrie & Co. The contract defines the state as the seller, and Imbrie & Co. as the purchaser, of the bonds. It does, in another section, define the state's relation with Im- brie & Co., designating the latter as the fiscal agents of the state. Tak- ing the contract as a whole, I think it indicates a desire on the part of the state to sell to Imbrie & Co., "who are willing to buy this issue." The appointment of a fiscal agent in connection with the transaction was apparently for the purpose of fiscalizing and for the service of maintaining the state credit in the New York markets. Clause I (b) provides that the state "hereby sells and assigns" to Imbrie & Co., for $4,325,000 United States gold and agrees to deliver the same on Janu- ary 1, 1920, at the New York office of the trustee. The contract pro- vides how the payment should be made:

"The aforesaid payments shall be made by depositing the respective sums (amounts in question) to the credit of the state with (in) such trust com- pany, bank, or bankers in the United States of America as the Governor of the state may designate."

Clause II appointed Imbrie & Co. fiscal agents with reference to the issue of bonds, and Imbrie & Co. accepted the appointment. Two per cent. on all the moneys received was for services rendered by Imbrie & Co. as such agents. They received all sums paid to them by the state, and they acted for the state in presenting for payment all the bonds purchased by the state, and then agreed to attend to the details of listing of the bonds on the exchange, if that be done, and to publish all notices and advise the state of all matters regarding facilitating the sale and delivery of the bonds, and transmit all information to the advantage of the state, and to keep accounts of receipts and disburse- ments, and to pay 2 per cent. upon all moneys received by them in New York from the state.

It is clear that Imbrie & Co. purchased the bonds, and the title there- to passed on the delivery of the bonds. The Governor of the state, pursuant to his authority, nominated the bankers, Imbrie & Co., its depositary. When a sale was made, a contractual relation, with the

obligations of seller and purchaser, arose. Whenever money was paid into the hands of the bankers, Imbrie & Co., or credits were entered upon their books for the state, the relation of creditor and debtor arose. This is so, even though cash was not paid with one hand and taken in with the other hand—that of the bankers. If the gold was actually put into the vaults of Imbrie & Co., and subsequently appropriated by the bankers, Imbrie & Co., I do not understand that the state would claim a breach, giving rise to an action in equity for an accounting. Money paid into a bank ceases to be the money of the principal, and is then the money of the bank. Marine Bank v. Fulton County Bank, 2 Wall. 252, 17 L. Ed. 785. The contract created by the deposit has nothing of the nature of a trust in it; it is purely a legal one. Bank of Republic v. Millard, 10 Wall. 152, 19 L. Ed. 897. Nor is the result different when, instead of an actual gold or money deposit, a credit is given by a book entry. If the entry and credit was given in the ordinary course of business, as it apparently was, and not in fraud, the bank bears no relation of trust or agency to its depositor, the state, in that it would have to pay the money to the defendants, as bankers.

On March 1 the state cabled:

"Imbrie & Co. have paid the purchase price of the bonds through a credit which they opened on the books in favor of the state."

The state has accepted a substantial sum in payment for the bonds. They should not now question the validity of the bonds. I think no trust relation is involved in the wrong or breach committed by Imbrie & Co. The wrong inflicted gives rise to a common-law breach of contract. Therefore the state is not entitled to an accounting. Its present claim for an accounting will be expunged, and it may, if so advised, within 20 days file a claim for moneys due or alleged to be due through the failure, on the part of Imbrie & Co., to carry out the contract for the purchase of the bonds in question.